[No. B025616. Second Dist., Div. Six. Oct. 6, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
ANDREW FRASER GIBSON, Defendant and Appellant.

**COUNSEL**

Rowan W. Klein, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Morris Lenk, Karl S. Mayer and Bruce M. Slavin, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ABBE, J.—Legislation,[1] effective July 1, 1986, requiring a person who had been sentenced to a determinate sentence prior to that date to be confined in a mental hospital as a condition of parole, violates constitutional ex post facto clauses. The legislation also violates equal protection because it mandates involuntary confinement and treatment of former prisoners who are mentally ill without proof of dangerousness.

Appellant was convicted of forcible rape in violation of Penal Code[2] section 261, subdivision (2) and on June 29, 1983, was sentenced to six years in the state prison. With applicable credits he was to be released from custody on parole on September 10, 1986. Instead of being released, he was required to accept inpatient treatment through the Department of Mental Health under the statutory scheme under consideration. After trial in the superior court, he was found to be a severely mentally disordered offender subject to involuntary confinement and treatment under section 2962.

The confinement then ordered for appellant expired one year from the date he should have been released on parole. This appeal is therefore technically moot. However, since appellant is subject to repetition of this process, the issues are of recurring importance and time constraints make it likely any annual commitment will evade appellate review, we address the merits.[3] (See *Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 167, fn. 2 [167 Cal.Rptr. 854, 616 P.2d 836].)

In 1983, when appellant was committed to prison, section 2960 (now § 2974 as amended) provided discretion to seek civil commitment of prisoners under the Lanterman-Petris-Short (hereafter LPS) Act, which was incorporated in part by reference in the Penal Code as an alternative to their release. Involuntary commitment under the LPS Act is applicable to all persons regardless of their former penal status who are proved to be gravely disabled or demonstrably dangerous to themselves or others. (See Welf. & Inst. Code, §§ 5150, 5200, 5250, subd. (a), 5300, subds. (a)-(c).) If such confinement was not both sought and imposed, appellant would have been entitled to be released from confinement into the community.

[1]Statutes 1985, chapter 1419, section 3. The provisions were originally found in Penal Code section 2960. They were amended and recodified without substantive change by Statutes 1986, chapter 858, to have separate section numbers (Pen. Code, §§ 2962-2980). For easy reference, all sections are referred to by their present section numbers.

[2]All further statutory references are to this code unless otherwise specified.

[3]Appellant has been continued on parole for another year under section 2962 and is continuing to be confined for treatment as an inpatient at Atascadero State Hospital.

Section 2962 now mandates treatment for any person who meets all the following criteria: (1) Is about to be released on parole,[4] (2) has a severe mental disorder, as defined, (3) the mental disorder is not in remission or cannot be kept in remission without treatment, as defined, (4) whose severe mental disorder was one of the causes of or was an aggravating factor[5] in the commission of a crime for which the person was sentenced to prison, (5) whose crime was one in which the person used force or violence or caused serious bodily injury as defined in paragraph (5) of subdivision (e) of section 243, and (6) who has been in treatment for the severe mental disorder for 90 days or more within the year prior to parole or release.[6]

The treatment mandated is inpatient (§ 2964) unless the patient can be safely and effectively treated on an outpatient basis, but if not released to outpatient status within 60 days the person may request a hearing before the Board of Prison Terms (BPT) where the Department of Mental Health must establish that inpatient treatment is necessary. (§ 2964, subd. (b).) This treatment can be continued under the same provisions so long as parole is continued and, as a condition thereof, treatment is mandated pursuant to section 2962. (§ 2964, subd. (c).)

These provisions apply to all persons affected who were incarcerated before as well as after January 1, 1986. (§ 2980.) It is therefore expressly retroactive to persons whose crimes which resulted in imprisonment were committed prior to the enactment of the Legislature so long as they had not earlier been released on parole.[7]

### Ex Post Facto Violation

Appellant contends the retroactive application of these mandatory provisions violates the ex post facto clauses of the United States and California Constitutions (art I, § 9, cl. 3, and art I, § 9, respectively). We agree.

---

[4] Section 2970 also permits the same standards be applied for recommitment of persons who would otherwise be released without parole or whose parole has expired. Appellant is not such a person.

[5] Ironically, mental disorders which do not constitute a defense under California insanity provisions (§ 25) are mitigating factors for purposes of sentencing. (See Cal. Rules of Court, rules 416(e), 423(b)(2) and 425(b).) Consequently a mental illness which is causally related to criminal conduct may at the same time reduce the term of imprisonment and then result in custodial confinement for life.

[6] The procedural provisions for commitment are not challenged. They are complex and need not be considered here.

[7] The provisions apply to all persons whether sentenced to a determinate term under section 1170 or to an indeterminate term either prior to the enactment of section 1170 or under section 1168. As appellant was a determinately sentenced prisoner we confine our consideration only to persons released on parole after serving a determinate term imposed pursuant to section 1170.

■ Two critical elements must be present for a statute to violate the ex post facto clause; (1) it must be a criminal or penal law which applies to events occurring prior to its effective date, and (2) it must substantially disadvantage the offender affected by it. (*In re Jackson* (1985) 39 Cal.3d 464, 469-477 [216 Cal.Rptr. 760, 703 P.2d 100].)

A law constitutes an ex post facto violation when it retrospectively (1) imposes criminal liability for conduct which was innocent when it occurred, or (2) increases the punishment prescribed for a crime, or (3) by necessary operation alters the situation of the accused to his disadvantage. (*Conservatorship of Hofferber, supra,* 28 Cal.3d 161, 180.) The mentally disordered offender provisions (MDO) of section 2962 et seq. both increase punishment and alter the situation of the accused to his disadvantage.

In order to determine whether retrospective laws are disadvantageous, we must look to the effect of the present system of laws compared to those in place at the time the offense was committed. (See *In re Stanworth* (1982) 33 Cal.3d 176, 186 [187 Cal.Rptr. 783, 654 P.2d 1311]; *Dobbert* v. *Florida* (1977) 432 U.S. 282, 294 [53 L.Ed.2d 344, 356-357, 97 S.Ct. 2290]; *Weaver* v. *Graham* (1981) 450 U.S. 24, 25 [67 L.Ed.2d 17, 20-21, 101 S.Ct. 960].)

■ At the time of appellant's offense he was subject to a determinate sentence (§ 1170) and had to be released on parole at the end thereof (§ 3000 subds. (a) and (d); *People* v. *Burgener* (1986) 41 Cal.3d 505, 529, fn. 12 [224 Cal.Rptr. 112, 714 P.2d 1251].) The Board of Prison Terms (BPT) had discretion to set such reasonable parole conditions as it deemed proper (§ 3053), including the condition of outpatient psychiatric counseling. (*In re Naito* (1986) 186 Cal.App.3d 1656 [231 Cal.Rptr. 506], also see § 3002.) The BPT could revoke his parole and recommit him for failure to abide by the conditions. (§§ 3056 and 3060.)

His total period of parole and custody on recommitment for revocation of parole could not exceed four years (§ 3057, subd. (a))[8] unless he engaged in misconduct while confined on a parole revocation (§ 3057, subd. (c); also see § 3060.5.)

When appellant committed his offense he could only have been confined involuntarily for evaluation and treatment on the same basis as all nonprisoners or parolees, that is, if he was mentally ill and gravely disabled (Welf. & Inst. Code, §§ 5000, 5008, subd. (h)(1)) or dangerous. (Welf. & Inst. Code, §§ 5000, 5250) (former Pen. Code, § 2960, now § 2974, applicable to all prisoners other than those described in § 2962.)

---

[8] All references to this section are to the prior version under Statutes 1984, chapter 805, section 3.

Under section 2962 the following changes occur. The persons described therein are required to be retained in physical custody by the Department of Mental Health (§ 2962) and must be treated on an inpatient basis for a minimum of 60 days (§ 2964) and may be retained on an inpatient basis for annual periods for life (§§ 2966, subd. (c), 2970) so long as their severe mental disorder is not in remission or cannot be kept in remission without treatment. Therefore, persons who are neither gravely disabled nor demonstrably dangerous but who meet the section 2962 criteria must undergo treatment on an inpatient and on outpatient basis during their parole term and may be required to do so indefinitely.

 Respondent argues that the legislation does not violate the ex post facto clauses because it is not penal, but rather therapeutic, and it does not disadvantage appellant as an accused. We disagree.

Respondent is, however, correct that a necessary determination is whether the statutes imprison appellant as a criminal or require compulsory treatment in involuntary confinement as a sick person. (See *Conservatorship of Hofferber, supra,* 28 Cal.3d at p. 181 and *In re Gary W.* (1971) 5 Cal.3d 296, 301 [96 Cal.Rptr. 1, 486 P.2d 1201].) We believe section 2962 has overwhelming penal attributes and therefore constitutes part of appellant's punishment for his criminal offense.

Section 2960 states the legislative purpose in the enactment of section 2962 et seq.: "The Legislature finds that there are prisoners who have a treatable, severe mental disorder that was one of the causes of, or was an aggravating factor in the commission of the crime for which they were incarcerated.[9] Secondly, the Legislature finds that if the severe mental disorders of those prisoners are not in remission or cannot be kept in remission at the time of their parole or upon termination of parole, there is a danger to society, and the state has a compelling interest in protecting the public. Thirdly, the Legislature finds that in order to protect the public from those persons it is necessary to provide mental health treatment until the severe mental disorder which was one of the causes of or was an aggravating factor in the person's prior criminal behavior is in remission and can be kept in remission. [¶] The Legislature further finds and declares the Department of Corrections should evaluate each prisoner for severe mental

---

[9] It is interesting to note this declaration came just four years after the Legislature "recognize[d] and declare[d] that the commission of sex offenses is not in itself the product of mental diseases." (Stats. 1981, ch. 928, § 4.) Consequently it terminated prospectively an involuntary commitment scheme for mentally disordered sex offenders. (Former Welf. & Inst. Code, §§ 6300 to 6330.) Many sex offenders will now "qualify" under the MDO scheme since their crimes definitionally involved the use of force or violence. (See e.g., §§ 261, subd. (2), 288, subd. (b) and 288a, subds. (c) and (d)(1).)

disorders during the first year of the prisoner's sentence, and that severely mentally disordered prisoners should be provided with an appropriate level of mental health treatment while in prison and when returned to the community."[10]

The primary purpose of the legislation is to protect the public. The mechanism by which the public is being protected is by requiring confinement and treatment of some former prisoners who have severe mental disorders as defined by section 2962, subdivision (a).

The fact that a person is treated while confined involuntarily does not ipso facto make the confinement nonpenal. For example, section 2684 provides for the transfer of mentally ill prisoners to a state hospital for treatment during their period of imprisonment. By the terms thereof, the time spent in the hospital for treatment is credited toward their terms of imprisonment. Obviously this period of treatment is "penal" within the meaning of the ex post facto clauses. (Also see § 1364.)

The California Supreme Court has identified several criteria to determine whether a statute is criminal or civil. In *Cramer* v. *Tyars* (1979) 23 Cal.3d 131, 137 [151 Cal.Rptr. 653, 588 P.2d 793] (hereafter *Cramer*) the court identified four features which resulted in its admittedly close determination that involuntary commitment of certain mentally retarded persons was not punishment: (1) it was not initiated in response or necessarily related to any criminal acts, (2) it was of limited duration although renewable, (3) the person with the burden of proof was not necessarily a public prosecutor, and (4) the sole purpose of the legislation was the custodial care, treatment and protection of the person committed.

In contrast to the statutory scheme for the involuntary commitment of the mentally retarded, MDO commitments are: (1) necessarily related to the commission of and conviction and imprisonment for crimes involving use of force or violence or in which serious bodily injury was inflicted; (2) the commitment of MDO's can only be brought about by prison officials (§ 2962) or district attorneys (§ 2970); and (3) the sole purpose is not treatment for the safety of the person committed but is primarily protection of the public (§ 2960), the same purpose for imposing imprisonment for criminal conduct. (Cal. Rules of Court, rules 410(a) and 414(b).) The MDO commitment scheme has more penal features than that for mentally retarded persons.

---

[10] While the provisions operate retroactively for prisoners incarcerated before the effective date of the legislation, it is of course impossible to retroactively evaluate and treat them. Consequently persons imprisoned before July 1, 1986, did not have this advantage during their terms.

Other criteria were identified in *Conservatorship of Hofferber, supra,* 28 Cal.3d 161, at pages 181 and 182 in determining whether the involuntary extended confinement of persons gravely disabled due to incompetence to stand trial on felony charges and who are presently dangerous (hereafter GDI's) was punitive. The court specified the following factors leading to its conclusion this scheme was not punitive: (1) The commitment did not extend, directly or indirectly, any incarceration imposed on appellant for criminal conduct, (2) a criminal sentence would probably never be imposed, (3) the confinement did not arise from criminal conduct but from a mental condition, (4) the person committed would be placed in a state hospital or a less restrictive setting (see Welf. & Inst. Code, § 5358) rather than in a prison, and (5) the GDI commitment did not disadvantage the person as an accused because he or she was not forced to defend against a criminal adjudication. While a MDO commitment shares some of these civil attributes, it differs in important respects.

An MDO commitment, unlike one for GDI's, results directly from the commission of a crime and a period of imprisonment as well as from the mental condition. Failure to follow the treatment plan during the period of parole can result in a return to prison on parole revocation and it may therefore extend indirectly the incarceration of appellant as a result of his criminal conduct. Specified prestatute criminal conduct is both a requisite and the reason for custodial confinement.

MDO's may be forced to defend against a criminal adjudication since whether the crime which resulted in the prison commitment "involved the use of force or violence or caused serious bodily injury" may not have been adjudicated at the time of conviction. Unlike other involuntary commitment schemes which apply either to persons involved in certain specified offenses (see e.g., Welf. & Inst. Code, § 3052) or to any felony offender (see e.g., § 1026.5, subd. (b)(1)) the MDO scheme applies to persons who committed any felony offense only if it involved the use of force or violence or if it involved inflicting serious bodily injury. Except in those instances where force, violence or serious bodily injury are elements of the offense or an enhancement thereof, a new adjudication relating to the offense may be required.

These differences between the MDO commitment scheme and those considered in *Cramer* and *Hofferber* require us to find that it is essentially penal in nature and consequently it is subject to the limitations of the ex post facto clauses.

We find the retroactive application of the MDO provisions to persons whose crimes were committed prior to their effective date violates the

ex post facto clauses of the United States and California Constitutions because the provisions: (1) are applicable only to persons who were convicted for certain crimes and who are still serving their terms of imprisonment on the operative date of the legislation (§ 2962), and mandate a potentially onerous change in the terms of parole which is part of the sentence for a criminal conviction (§§ 1170, subd. (e), 3000);[11] and (2) potentially could result in custody for life in a state hospital setting without proof that the person is either gravely disabled or demonstrably dangerous as a result of mental illness.

### Equal Protection

We also find the MDO provisions violate the equal protection clauses of the United States and California Constitutions. (U.S. Const., 14th Amend. and Cal. Const., art I, § 7.)

### Equal Protection Under the United States Constitution

The equal protection clause of the United States Constitution requires at a minimum that persons standing in the same relation to a challenged government action will be uniformly treated. (*Reynolds* v. *Sims* (1964) 377 U.S. 533 [12 L.Ed.2d 506, 84 S.Ct. 1362].) Traditionally, social and economic legislation will be upheld if the classification drawn by the statutes is rationally related to legitimate state interests. (*Cleburne* v. *Cleburne Living Center, Inc.* (1985) 473 U.S. 432 [87 L.Ed.2d 313, 105 S.Ct. 3249].) When the classification touches on a fundamental right, it must be judicially determined under the strictest standard whether it is necessary to promote a compelling government interest. (*Shapiro* v. *Thompson* (1969) 394 U.S. 618 [22 L.Ed.2d 600, 89 S.Ct. 1322].) Whether a right is fundamental depends on whether it is implicitly or explicitly guaranteed by the federal Constitution. (*San Antonio School District* v. *Rodriguez* (1973) 411 U.S. 1 [36 L.Ed.2d 16, 93 S.Ct. 1278].)

Although freedom from involuntary custodial confinement would appear to be the equivalent of "liberty" explicitly guaranteed by the Fifth and Fourteenth Amendments, the United States Supreme Court has not

---

[11] This feature alone may suffice to establish an ex post facto violation. In *In re Stanworth, supra,* 33 Cal.3d 176, the change from the discretionary parole release date setting provisions in effect under the indeterminate sentencing law (ISL) to the directory (mandatory) provisions under the determinate sentencing law (DSL) were found to be ex post facto as applied to persons whose offenses were committed prior to DSL. (Also see *Weaver* v. *Graham, supra,* 450 U.S. 24 (change from mandatory to discretionary good time credits violates clause) and *Lindsey* v. *Washington* (1937) 301 U.S. 397 [81 L.Ed. 1182, 57 S.Ct. 797] (change from discretionary to mandatory maximum sentence violates clause).)

expressly held that classifications touching upon liberty are fundamental for these purposes. In *Jones* v. *United States* (1983) 463 U.S. 354 [77 L.Ed.2d 694, 103 S.Ct. 3043] and *Baxstrom* v. *Herold* (1966) 383 U.S. 107 [15 L.Ed.2d 620, 86 S.Ct. 760], both of which related to challenged classifications in substance and procedure for involuntary commitment, the court appears to use the traditional rational basis test. Consequently for purposes of federal law analysis so shall we.

Any equal protection challenge requires a determination whether the groups which are differently treated are similarly situated for purposes of the law. If they are not, no equal protection claim is applicable. (*Tigner* v. *Texas* (1940) 310 U.S. 141, 147 [84 L.Ed. 1124, 1128, 60 S.Ct. 879, 130 A.L.R. 1321].)

■ Appellant claims, and we agree, that an MDO is similarly situated for purposes of the law to other adult persons involuntarily committed for mental health treatment. One purpose of all of these pertinent involuntary commitment schemes is the protection of the public from the dangerous mentally ill and their involuntary commitment for treatment, for renewable periods, until they no longer pose a danger to the public whether or not they remain mentally ill.[12]

The MDO commitment scheme, however, contains one critical and significant difference from all the others; it does not require proof of any present dangerousness as a result of mental illness for commitment or recommitment. Because there is no reasonable basis to exempt MDO's from this proof requirement merely because they are at the end of their prison term, we find the provisions violate the equal protection clause of the Fourteenth Amendment of the United States Constitution.

MDO's are most similarly situated to two groups of mentally ill persons subject to involuntary commitment in California: those persons found not guilty by reason of insanity (NGI) and recommitted after expiration of the maximum term of imprisonment which could have been imposed on them (§ 1026.2) and those mentally ill persons, now adults, who have been recommitted after expiration of the potential maximum term of imprisonment for criminal conduct as wards of the state (MDW). (Welf. & Inst. Code, §§ 602, 707, subd. (b), 1731.5.)

---

[12] See Penal Code section 1026.5, subdivision (b)(1) (person posing substantial danger of physical harm to others by reason of mental disease); Welfare and Institutions Code, section 1801.5 (wards physically dangerous to public due to mental deficiency), section 5300, subdivisions (a)-(c) (persons demonstrating danger of inflicting substantial physical harm to others due to mental defect), section 6500 (mentally retarded persons dangerous to themselves or others).

An MDO, like the MDW and an NGI, has been adjudged to have committed a criminal offense. Both the MDO and NGI are committed after proof of a causal connection between their mental illness and the crime which they committed[13] (§ 2962; CALJIC 4.00 (1979 rev.) and *In re Moye* (1978) 22 Cal.3d 457, 462 [149 Cal.Rptr. 491, 584 P.2d 1097].) Unlike the NGI and MDW the MDO, however, is not confined only on proof of dangerousness and is not subject to release when he or she is no longer proven to be dangerous. The MDO alone is subject to commitment and recommitment until such time as his or her severe mental disorder is in remission without proof of present dangerousness. The sole basis for the distinction is that MDO's are at the end of their prison terms.

Like those commitment schemes considered by the United States Supreme Court in *Jackson* v. *Indiana* (1972) 406 U.S. 715 [32 L.Ed.2d 435, 92 S.Ct. 1845] and *Baxstrom* v. *Herold, supra,* 383 U.S. 107, we find the MDO commitment scheme violates the equal protection clause of the Fourteenth Amendment because it has subjected appellant to a commitment standard more lenient and a release standard more stringent than that required for the involuntary commitment and treatment of any other mentally ill person in California for the arbitrary reason that he is nearing completion of service of his term of imprisonment.

In *Jackson* the court found the indefinite commitment of persons who were incompetent to assist in their own defense on a lesser standard with a more difficult standard of release than all others violative of equal protection. The court found the basis of the distinction of two pending criminal charges was insufficient to justify the difference in treatment.

In *Baxstrom* the court considered a commitment scheme closely analogous to that here. There the state scheme provided for involuntary commitment of persons whose prison term was about to expire which differed from that applicable to all other persons in two different ways. First, it denied a jury trial on the issue of mental illness to the prisoner but gave it to all others. Second, it required a determination of dangerousness for all mentally ill persons committed to the Department of Corrections rather than to the state hospital except prisoners nearing the end of their term. The Supreme Court found both distinctions irrational and therefore violative of equal protection.

---

[13] This was true at least until June 9, 1982, when the insanity standard was changed. (Now see § 25 and *People* v. *Skinner* (1985) 39 Cal.3d 765 [217 Cal.Rptr. 685, 704 P.2d 752].) It remains true of persons committed under the pre-1982 law when the standard used was that set forth in *People* v. *Drew* (1978) 22 Cal.3d 333 [149 Cal.Rptr. 275, 583 P.2d 1318] (see CALJIC 4.00 (1979 rev.)) who continue to be recommitted under section 1026.2.

The MDO commitment scheme does not suffer the first infirmity identified in *Baxstrom;* it grants the same procedural protections of a jury trial and unanimous verdict applicable to all others. It suffers the second infirmity, however; it permits commitment without proof of dangerousness, a standard applicable to all others involuntarily confined and treated for mental illness. Since the basis for the distinction, i.e., nearing the end of a prison term, is the same as that considered in *Baxstrom,* we too find it is irrational and violative of the equal protection guaranteed by the United States Constitution.

Respondent argues the MDO is not similarly situated to any other involuntarily committed person because of his parole status. This fact, however, is irrelevant for purposes of equal protection analysis for several reasons.

■ Parole in California is different from the traditional concept of parole. In *Morrissey* v. *Brewer* (1972) 408 U.S. 471, 477 [33 L.Ed.2d 484, 492, 92 S.Ct. 2593], the court defined parole as ". . . release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence." In California determinately sentenced prisoners serve the complete term specified under section 1170, less any applicable credits for work performed under sections 2931 or 2933 and are then placed on parole for three years regardless of the length of the term served. Under section 3000, this parole period is an essential part of the actual sentence and is not dependent on early release.

■ The question for equal protection purposes is not whether potential MDO's are similarly situated to other dissimilarly treated groups for all purposes but rather whether they are similarly situated for purposes of the law challenged. Parole status has been held to be enough to distinguish parolees from all others as to the quantity and quality of procedural due process required for incarceration (*Morrissey* v. *Brewer, supra,* 408 U.S. 471) or as to rights to be free from warrantless searches and seizures. (*People* v. *Burgener, supra,* 41 Cal.3d at p. 532.) This is because of the purpose of those restrictions, which are to promptly punish or rectify a breach of conditions of traditional parole and to facilitate supervision and surveillance to discover breaches. However, parole status is irrelevant to the purpose of MDO involuntary commitment or treatment.

As noted, the purposes of this statutory scheme are twofold. One is to protect the public from mentally ill persons deemed dangerous by the Legislature; the other is to treat these mentally ill persons. (§ 2960.) The impending release on parole, the basis of defining the group, has nothing to do with either purpose. Any danger to public safety has nothing to do with their

status as parolees per se but arises from their release from prison into the general population. Therefore, these are not parole condition cases.

That parole status has nothing to do with any purpose of the act is indicated by features of the act itself: the MDO confinement and treatment are not limited to the parole period (§ 2970); existing parolees, including those released just prior to July 1, 1986, are not covered by the act even if they have all of the other pertinent characteristics defined in the act (Stats. 1985, ch. 1419, § 3; § 2962, subd. (d))[14] and mentally ill parolees in remission at the time scheduled for their release on parole, even though they suffer a relapse after release, are not covered by the act. Obviously the Legislature was not relying on dangers unique to persons on parole in enacting the legislation.

For the articulated purposes of the act, public safety and treatment of the mentally ill prior offender, we find appellant's situation identical to an NGI whose continuing mental illness once caused a criminal violation and similar to MDW's who also engaged in criminal conduct and remain mentally ill at the time scheduled for release.

The respondent argues that even assuming MDO's are similarly situated to NGI's for the legitimate purposes of the law no factual finding on the issue of present dangerousness is required because the Legislature has found MDO's to be dangerous and so stated in section 2960. ■ Great deference is due a legislative determination that a certain class of persons endangers public safety and that involuntary commitment of persons in that class is necessary to protect the public. However, a determination of which individuals belong to that class is a judicial, not legislative, function. (See *United States* v. *Brown* (1965) 381 U.S. 437 [14 L.Ed.2d 484, 85 S.Ct. 1707].) To determine otherwise would permit a permanent conclusive presumption of dangerousness from proof of mental illness so long as it had once been proved the illness was causally related to or an aggravating factor in the commission of a criminal offense.

A conclusive presumption of one fact from proof of another violates the due process clause when the existence of the fact presumed is not universally or necessarily coexistent with the fact proved. (*Vlandis* v. *Kline* (1973) 412 U.S. 441 [37 L.Ed.2d 63, 93 S.Ct. 2230].) Dangerousness is not universally and necessarily coexistent with unremitted mental illness. A finding that a mental illness was once a contributing cause or aggravating factor in

---

[14] Persons convicted of qualifying felonies but not sentenced to imprisonment also do not come under the act even if presently on probation. Such persons would appear to otherwise be in the same situation as potential MDO's as a threat to public safety and in need of treatment.

criminality does not change the fact that all former felons suffering mental illness are not dangerous or violent. This fact is implicitly recognized by the several California involuntary commitment schemes requiring proof of both present mental illness and present dangerousness without regard to the criminality of the person.

Respondent claims such a legislative determination of dangerousness has been found constitutional under both the due process and equal protection clauses by the United States Supreme Court in *Jones* v. *United States* (1983) 463 U.S. 354 [77 L.Ed.2d 694, 103 S.Ct. 3043].) The court's actual holdings do not support this conclusion.

Jones challenged (1) the constitutionality of the automatic commitment of persons found not guilty of an offense by reason of insanity, and (b) the distinctions regarding the burden of proof between persons committed after a finding of NGI and those civilly committed. The court upheld the statutory scheme on both substantive and procedural grounds. In so doing, it approved a presumption of continuing insanity which was conclusive in effect only for 50 days following a jury finding of not guilty by reason of insanity. At that time and at six-month intervals the acquittee had the same opportunity as other civilly committed persons to secure release upon proof by a preponderance of the evidence that he was either no longer mentally ill or dangerous. Consequently, in effect any presumption of insanity was rebuttable at all hearings following the automatic 50-day commitment.

The presumption of dangerousness approved by the court in *Jones* was also a rebuttable one; it did not completely substitute the judgment of the Legislature as to dangerousness for a jury determination thereof. Unlike the statutory scheme here, the person involuntarily committed could secure his release in as little as 50 days following conviction upon his showing[15] he was not dangerous even if he remained mentally ill. Here, appellant is in effect conclusively presumed dangerous so long as he remains mentally ill regardless of the length of time since his criminal offense and conviction.[16] Clearly, *Jones* does not support the respondent's position.

 We therefore hold it is unreasonable and arbitrary to exempt MDO's from a requirement of proof of dangerousness applicable to all other persons subject to involuntary commitment. The commitment scheme

---

[15] In contrast to this holding, our Supreme Court in *In re Moye, supra,* 22 Cal.3d at page 466, rejected placing the burden of proof on the insanity acquittee after the expiration of the maximum term of potential imprisonment.

[16] Our Supreme Court has expressly rejected a permanent conclusive presumption of dangerousness because, inter alia, the passage of time by itself diminishes the validity of the presumption. (*Conservatorship of Hofferber, supra,* 28 Cal.3d at p. 177.)

under consideration violates the equal protection clause of the Fourteenth Amendment of the United States Constitution.

## Equal Protection Under California Constitution

■ Because the statutory scheme at issue deprives persons of their liberty, i.e., freedom from involuntary confinement and treatment for mental illness, it is subject to close scrutiny under the California Constitution (art. I, § 7). (*Conservatorship of Hofferber, supra,* 28 Cal.3d at p. 171, fn. 8; see *In re Gary W., supra,* 5 Cal.3d at p. 306.) The law can withstand constitutional attack as discriminatory among similarly situated persons only if the government can demonstrate a compelling interest which justifies the law and that the distinction drawn by the statute is necessary to further that purpose. (*Ibid.*)

We find respondent has failed to demonstrate either a compelling interest in the continued confinement of mentally ill former prisoners simply because their mental illness continues or that exclusion of a requisite finding of dangerousness is necessary to serve any legitimate government interest.

The only justification presented here for the plan is the statements of the Legislature in section 2960 that unremitted mental illness of prisoners is a danger to the public if those prisoners were mentally ill when their offense was committed and that fact was connected to the violent commission of a felony. If the mere declarations of the legislative branch were sufficient to satisfy the strict scrutiny test, no judicial review of the constitutionality of statutes would be necessary.

The legislative history of the MDO scheme does not demonstrate that persons whose mental illness once was related to felonious criminal conduct were actually found to pose a unique danger to the public so long as their mental illness remains based on any studies or hearings. The concern of the Legislature was that the determinate sentencing law which required the release of prisoners at the expiration of a fixed amount of time, combined with the revisions of the insanity law which decreased the number of mentally ill persons found not guilty by reason of insanity and subject to potential life commitment, had resulted and would continue to result in the release of persons who were mentally ill and might reoffend.[17]

The then existing system for commitment of mentally ill parolees under the LPS Act was deemed unsatisfactory by the legislative proponents

[17] A statement on Sen. Bill No. 1296 to the Assembly Public Safety Committee dated August 26, 1985, opined "SB 1296 will solve the dilemma that has perplexed the Legislature since enactment of the determinate sentencing law how to control criminals who have serious mental illness without disturbing the protection of the LPS Act for civilians."

because it required proof of demonstrable present dangerousness; this proof was viewed as problematic to achieve by both courts and psychiatrists; and courts, according to the author, insisted on recent evidence to support a finding of future dangerousness and such proof was difficult to obtain in the case of inmates who lived in a highly restrictive environment. It was viewed as necessary to fill a loophole in the determinate sentencing law which left officials helpless to avoid the release of prisoners who still pose a serious risk to society. (See Conference Completed Analysis of Sen. Bill No. 1296, prepared by the office of Sen. Floor Analysis for use by Sen. Rules Com., pp. 2 and 4.)

Nothing in the legislative history however indicates that there was any factual basis upon which the Legislature concluded that all persons whose mental illness once caused or aggravated a criminal offense were again going to reoffend unless their mental illness was in remission.[18] In fact, the difficulty of sustaining the proof requirement of dangerousness was the sole apparent basis for its elimination, not any perceived knowledge of its universal existence from unremitted mental illness. Consequently, the respondent has failed to demonstrate a compelling state interest in involuntarily committing and/or treating all presently unremitted mentally ill former prisoners released after July 1, 1986, whose illness was once connected to the commission of a violent felonious offense.

Difficulty of proof of dangerousness under the LPS standard does not constitute necessity for its complete elimination; if it did, the Legislature would be free to vary the burden of proof as to various elements of criminal offenses depending on the difficulty of proof. The LPS standard of dangerousness, the highest and most narrowly drawn among California's various dangerousness criteria set forth in different involuntary commitment schemes, is not constitutionally necessary. (See *Conservatorship of Hofferber, supra,* 28 Cal.3d at pp. 171-172.) There has been no showing that the complete elimination of proof of some degree of present dangerousness is necessary to protect the public.

It must be remembered that appellant and those in this class of MDO committees are all legally sane and have been subject to punishment for their offenses for the term prescribed by the Legislature. At the end of their terms even the most dangerous offenders and most likely recidivists are subject to release so long as they are not mentally ill as defined. Unless

---

[18] At best, the bill's author and others simply cited instances where mentally ill persons were released from LPS confinement or had once been diagnosed as mentally ill and subsequently committed violent crimes. No evidence of a connection between mental illness and violent offenses was presented in any of the legislative history documents nor is there any evidence that mentally ill offenders are more likely to be recidivists than others.

proven to be dangerous the equal protection clause requires the mentally ill inmate must also be released from custody.

It is unnecessary to address the merits of appellant's other constitutional challenges to the MDO scheme.

The judgment is reversed. Appellant is entitled to parole on terms without reference to the requirements of section 2962 et seq.

Stone (S. J.), P. J., and Gilbert, J., concurred.

Respondent's petition for review by the Supreme Court was denied February 2, 1989.