Filed 4/19/21  P. v. Andrew H. CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>v.<br><br>ANDREW H.,<br><br>   Defendant and Appellant. | 2d Crim. No. B306542<br>(Super. Ct. No. 20PT-00188)<br>(San Luis Obispo County) |

Andrew H. appeals an order continuing his commitment to the Department of Mental Health for treatment as a mentally disordered offender (MDO).  The MDO Act (Pen.Code, § 2960 et seq.)[1] "permits the government to civilly commit for mental health treatment certain classes of state prisoners during and after parole."  (*In re Qawi* (2004) 32 Cal.4th 1, 23 (*Qawi*).)

This is appellant's second appeal concerning his MDO status.  In a 2020 opinion, we affirmed the original commitment order.  (*People v. Andrew H.* (Jan. 14, 2020, B298502) [nonpub.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

opn.] (B298502).)  Appellant contends the evidence is insufficient to show that, "by reason of [his] severe mental health disorder, [he] represents a substantial danger of physical harm to others . . . ." (§ 2972, subd. (c).)  We affirm.

*Procedural and Factual Background*

After a hearing conducted on February 20, 2020, the Board of Parole Hearings (BPH) determined that appellant met the MDO criteria.  It continued his involuntary mental health treatment for an additional year.  Appellant petitioned for a court hearing as to whether he met the MDO criteria.  He waived his right to a jury trial.

The court hearing was conducted on May 26, 2020.  The sole prosecution witness was Dr. Dia Gunnarsson, a forensic psychologist at Atascadero State Hospital.  She testified as follows:  Appellant suffers from a severe mental disorder – bipolar disorder.  He has been treated for the disorder since at least 2016.  "Prior to [2016], he had been treated for P.T.S.D. [post-traumatic stress disorder] since about 2013."  At the time of the BPH hearing in February 2020, his bipolar disorder was in remission.  "[H]e had been in remission since about November or December of 2019."  "[A]s of the Board of Parole hearing date," appellant could not be kept in remission without appropriate treatment, which includes the taking of his medication.  He must continue taking the medication for the rest of his life.

Dr. Gunnarsson opined that, because of his severe mental disorder, as of the BPH hearing date appellant represented a substantial danger of causing physical harm to others.  Her opinion was based on several factors.  The first was "[t]he severity of the injury to the victim [of the commitment offense – assault by means of force likely to produce great bodily injury –]

2

and the suddenness and bizarre nature of [appellant's] behavior at the time."  Dr. Gunnarsson did not relate the facts underlying the commitment offense.  The facts are set forth as follows in our prior 2020 unpublished opinion:[2]

"The assault was committed in July 2016.  The victim said: '[Appellant] and [victim] were drinking when [appellant] "snapped."  [Appellant] yelled "I don't give a Fuck, I have PTS . . . , I'll murder you!"  [Appellant] began punching [victim] for no reason.  [Victim] lost consciousness for an unknown amount of time.  [Victim] woke up with [appellant] sitting over him and [appellant] was punching him in the face.  [Appellant] was laughing as he was assaulting [victim].'

"Victim's niece said:  At a family party, she 'saw her step-father, [appellant], choking her uncle, [victim].'  Victim was 'intoxicated and "talking crap" toward [appellant].  [Appellant] then grabbed [victim by the] left side of his neck with his right hand and then threw [victim's] head against the kitchen counter.  [Victim's] head hit the edge of the kitchen counter and he fell on the kitchen floor on his back.  [Appellant] . . . mounted [victim] with both his legs on top of [victim's] hips.  [Appellant] then punched [victim] in the face about eight times.'

"Appellant said that victim 'became disrespectful and started threatening [him].  [Victim] belonged to a gang and was telling [appellant] he was going to have members of [the] gang murder [appellant].  [Victim] leaped forward in an aggressive manner and [appellant] pushed [him] back in self-defense.

---

[2] Pursuant to Evidence Code sections 459 and 452, subdivision (d)(1), we take judicial notice of our prior opinion.  The same counsel who represented appellant in the prior appeal also represents appellant in the present appeal.

[Victim] fell backwards and hit his head on the kitchen counter. [Appellant] lost his balance and fell on top of [victim]. [Victim] continued to attack [appellant] while [victim] was on the floor. [Appellant] punched [him] two times in self-defense.'

"Victim 'had lacerations on his left nostril, above his right eye, inside his mouth and on [the] right side of his lip. [He] also had severe contusions in both eyes, lumps on his forehead and a broken nose.'" (B298502 at pp. 2-3, brackets in original.)

The second factor considered by Dr. Gunnarsson was that although appellant "showed improved insight" into his mental illness, the improvement "was very recent." Dr. Gunnarsson noted that on October 2, 2019, less than five months before the BPH hearing on February 20, 2020, appellant exhibited "physical aggression." Because of his aggressive behavior, hospital staff "had to [put] him . . . in full bed restraints." The aggression occurred when appellant refused to comply with an involuntary medication order issued pursuant to *Qawi*, *supra*, 32 Cal.4th 1. Appellant's treatment team applied for the order because for about five months he had refused to take his medication. After 14 days of involuntary medication, the treatment team allowed the *Qawi* order to expire because appellant agreed to voluntarily continue taking his medication. Since the expiration of the *Qawi* order, appellant has regularly taken his medication.

The third factor considered by Dr. Gunnarsson was appellant's "history of substance abuse." He had abused "[a]lcohol, cocaine, marijuana, and methamphetamine." Appellant "tended to attribute a lot of his problematic behaviors in the past and at the time of [the commitment] offense to excessive alcohol use." At the time of the BPH hearing, he had completed only the second stage of a five-stage substance abuse

4

treatment program. Substance abuse could "interfere with [appellant's] medications, or [his] willingness to take medications. [Appellant] . . . reported that he had used substances instead of medications in the past . . . to calm down his symptoms . . . ."

Dr. Gunnarsson also considered appellant's "[r]emission status," "history of mental illness related violence," and "reasonable discharge plans." "[A]side from the substance abuse treatment, he . . . didn't have any specifics or relapse prevention plan." Dr. Gunnarson believed that appellant's discharge plan was "appropriate . . . for him," but she was concerned that "he's had similar resources available to him in the past, and . . . had not taken advantage of them."

Dr. Gunnarson noted that, once appellant started regularly taking his medication, his improvement was "pretty dramatic." His insight into his mental disorder improved "[d]ramatically." Since October 2, 2019, he has not exhibited physical aggression.

At the court hearing Dr. Lawrence Levy was called as a defense witness. He is appellant's treating psychiatrist at Atascadero State Hospital. Dr. Levy testified: Since the expiration of the *Qawi* order, appellant has taken his medication "voluntarily each and every day." Appellant's discharge plan includes a "link up with the Veteran's Program in San Diego" and a "[r]esidential program with mental health services." Dr. Levy understood that this program would be "available" to appellant.

Defense counsel asked Dr. Levy, "Do you think he needs more substance abuse treatment within the hospital prior to being discharged?" Dr. Levy responded, "I can't comment on that. I've not followed the course of that treatment for him." Dr. Levy opined that, if appellant were to engage in substance abuse,

5

it would "negatively impact the effectiveness of the prescribed psychotropic medication."

As to the incident of physical aggression on October 2, 2019, Dr. Levy testified: "His refusal to take medication at that time meant that he lacked insight, and so he lacked capacity to recognize the need for medication. It became dangerous when he was told he had to take medication. Prior to that, he had not been dangerous on the unit."

Dr. Levy opined that appellant is ready to be discharged from the hospital provided that he has "the right supports." "[H]e needs to be in a program."

Appellant was the only other defense witness. He testified that he "get[s] symptoms of mania at times" if he does not take his medication. He has "been fine ever since" he started taking his medication pursuant to the *Qawi* order. If necessary, he is prepared to take his medication for "the rest of [his] life."

Appellant continued: He is a former Marine. He "went to Iraq, then [to] Afghanistan." He was diagnosed with P.T.S.D. If released on parole, he intends "to get into Veteran's Village in San Diego" and enter "[a] year-long treatment program" there. In the past he had been pre-approved for the program. But appellant stated, "I don't know where I stand now." He "meet[s] the criteria" for entry into the program, but "it's hard to get into." Appellant is still at level 2 of the substance abuse program. Because of the Covid-19 pandemic, he "was not allowed to pursue it anymore. We are locked down."

Appellant attributed his commission of the commitment offense to excessive drinking, his P.T.S.D., and the bipolar disorder: "If we had not been drinking, it wouldn't have become that situation. I was so intoxicated." "Really bad things happen

when people drink something . . . .  I thought he [the victim] was going to kill me.  That's why I reacted the way I did because of the P.T.S.D., the bipolar."  Appellant understood "that substance abuse can be very dangerous" for him.  He said that he "cut off drinking."  If released on parole, "I won't be going to bars. . . .  If you drink and take the meds, it really screws you up."

Appellant was asked, "[D]o you have any problem with waiting until there is a program set up for you so that you can be released from the hospital into that program that Dr. Levy feels necessary for you?"  Appellant replied:  "I have no problem at all.  Be appropriate to wait."

### Trial Court's Ruling

The court remarked, "I think this is about as difficult a case as I've heard.  I'm very impressed with [appellant]."  But the court was "most concerned" that a "relapse plan" and treatment program were not in place for him at the time of the BPH hearing.  The court concluded:  "[I]t's better for him and better for the community if that plan is in place beforehand.  And without having that plan in place, . . . the court believes that, unfortunately, each of the [MDO] criteria have been met beyond a reasonable doubt."

### Sufficiency of the Evidence

The question before the trial court was whether appellant, "as of the date of the Board of Prison Terms [now Board of Parole Hearings] hearing, met the [MDO] criteria . . . ."  (§ 2966, subd. (b); see also *People v. Bell* (1994) 30 Cal.App.4th 1705, 1710 ["at both a hearing challenging the parolee's initial commitment and at an annual review hearing continuing that commitment, the trier of fact is required to determine that the parolee met the MDO criteria on the date of the most recent [Board of Prison

7

Terms] hearing"].)  Appellant claims that the evidence is "insufficient . . . to establish [the MDO criterion] that [he] constituted a substantial danger of physical harm to others by reason of his severe mental disorder."

"The substantial evidence rule applies to appellate review of the sufficiency of the evidence in MDO proceedings.  [Citation.] We review the record in the light most favorable to the judgment to determine whether it discloses substantial evidence—'evidence that is reasonable, credible, and of solid value'—such that a reasonable trier of fact could find beyond a reasonable doubt that [appellant met the MDO criteria]." (*People v. Labelle* (2010) 190 Cal.App.4th 149, 151.)  "'[W]e "'presume[ ] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' . . .'"'" (*People v. Harris* (2013) 57 Cal.4th 804, 849.)

Appellant argues that, in concluding that appellant represents a substantial danger of physical harm to others, Dr. Gunnarsson and the trial court "relied on facts that were demonstrably improper and/or contrary to the evidence.  In particular, Gunnarsson's reliance on the commitment offense and appellant's past history of mental illness violated basic case law holding that those factors constituted separate and independent requirements under the MDO statute, and cannot support a finding of dangerousness."  But appellant cites no authority forbidding a court from considering these factors in determining an MDO's dangerousness.  The only authority cited is *People v. Gibson* (1988) 204 Cal.App.3d 1425, 1438-1439.[3]  *Gibson*

---

[3] "[T]he MDO statutory scheme was declared unconstitutional in [*Gibson*]." (*People v. Robinson* (1998) 63 Cal.App.4th 348, 350.)  "[T]he Legislature amended the [MDO]

8

concluded that it would be a violation of due process to conclusively presume a person's dangerousness "from proof of mental illness so long as it had once been proved the illness was causally related to or an aggravating factor in the commission of a criminal offense." (*Id*. at p. 1439.) Here, the trial court did not make such a conclusive presumption. It considered several factors in addition to appellant's mental illness.

Appellant maintains that Dr. Gunnarsson's reliance on appellant's commitment offense, history of mental illness, "purported acts of aggression and medical noncompliance and her concern over the recency of appellant's improvement, violated the principle that an individual's dangerousness . . . must be determined with reference to the individual's <u>current</u> condition." The court properly considered these factors because they were relevant in assessing whether appellant's condition at the time of the BPH hearing rendered him dangerous to others.

Appellant claims that Gunnarsson improperly relied on his history of substance abuse and completion of only the second stage of a five-stage treatment program. We disagree. The substance abuse issue was of extreme importance. Appellant testified that, but for his excessive drinking, he would not have committed the offense of assault by means of force likely to produce great bodily injury. Dr. Levy opined that, if appellant were to engage in substance abuse, it would "negatively impact the effectiveness of the prescribed psychotropic medication." According to Dr. Gunnarsson, substance abuse could "interfere

---

statutes effective July 1989 to comply with *Gibson*." (*Ibid*.) *Gibson* was criticized on grounds not relevant here in *People v. Superior Court (Myers)* (1996) 50 Cal.App.4th 826, 837, 839.)

9

with [appellant's] medications, or [his] willingness to take medications." In view of appellant's mental disorder, history of substance abuse, completion of only the second stage of the substance abuse program, and the uncertainty whether he would be admitted into the Veteran's treatment program, the trial court was reasonably concerned that, if released on parole, appellant would relapse into substance abuse that would once again lead to violent conduct. We reject appellant's contention that these factors were "insufficient to overcome [his] remission." Dr. Gunnarsson opined that appellant could not be kept in remission without treatment that included taking his medication.

"Finally," appellant alleges, "Gunnarsson's reliance on a purported October 2, 2019 incident of aggression by appellant, and his prior refusal to take medications . . . was also improper . . . ." Appellant claims that his medication refusal and aggression did not reasonably relate to his condition at the time of the BPH hearing because these acts had occurred more than four months before the hearing. But the acts were recent enough, and the aggression was of sufficient severity, to be relevant in determining appellant's dangerousness. His aggressive behavior was uncontrollable and, according to Dr. Levy, "dangerous." Hospital staff "had to [put] him . . . in full bed restraints."

After reviewing the entire record in the light most favorable to the order continuing appellant's commitment as an MDO, we are convinced that a reasonable trier of fact could find beyond a reasonable doubt that, because of his severe mental health disorder, appellant represented a substantial danger of physical harm to others at the time of the hearing before the BPH in February 2020.

*Disposition*

The order continuing appellant's commitment to the Department of Mental Health for treatment under the MDO law is affirmed.

<u>NOT TO BE PUBLISHED.</u>

YEGAN, J.

We concur:

GILBERT, P. J.

TANGEMAN, J.

11

Timothy S. Covello, Judge

Superior Court County of San Luis Obispo

_____

Gerald J. Miller, under appointment by the Court of Appeal for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Michael R. Johnsen, Supervising Deputy Attorney General, Charles S. Lee, Deputy Attorney General, for Plaintiff and Respondent.