[No. D051185. Fourth Dist., Div. One. Mar. 24, 2008.]

THE PEOPLE, Plaintiff and Appellant, v.
ROBERT TATUM, Defendant and Respondent.

42

**COUNSEL**

Michael A. Ramos, District Attorney, Grover D. Merritt and Mary L. Andonov, Deputy District Attorneys, for Plaintiff and Appellant.

Doreen Boxer, Public Defender, and Pamela P. King, Deputy Public Defender, for Defendant and Respondent.

**OPINION**

**IRION, J.**—The District Attorney for the County of San Bernardino (District Attorney) appeals the trial court's dismissal of a petition to involuntarily commit Robert Tatum as a mentally disordered offender (MDO) upon the expiration of his parole period. The trial court ruled that due to the District Attorney's delay in the filing of the petition, the petition was untimely in that the trial could not be commenced at least 30 days prior to Tatum's release as required by statute. The court also found the District Attorney's nearly six-month delay in filing the petition was not excused by "good cause," and that the proffered explanation for the delay was "outrageous" and "callous[]," amounting to, at most, "inexcusable negligence." The court further determined that were the petition allowed to go forward, it would necessitate trial well after Tatum's release date, requiring a significant extension of Tatum's involuntary commitment without statutory authorization. Balancing the justification for the delay against the resulting "actual prejudice," the trial court

ruled that the delay in filing the petition violated Tatum's constitutional rights to due process, and dismissed the petition.

On appeal, the District Attorney contends that despite the untimely filing of the MDO petition, the absence of good cause for the delay and the resulting violation of the statute governing MDO commitment, the trial court "erred as a matter of law" by dismissing the petition. As discussed below, we disagree and affirm the dismissal.

While we are, of course, cognizant of the public safety concerns arising from the release of potentially mentally ill offenders who have completed their sentences, we can find no legal flaw in the trial court's actions. The federal and state Constitutions, as well as California statutory law, require a certain bare minimum of due process before a person can be involuntarily committed to the custody of the state. (*People v. Allen* (2007) 42 Cal.4th 91, 98 [64 Cal.Rptr.3d 124, 164 P.3d 557] (*Allen*).) As the District Attorney's "inexcusable negligence" in filing Tatum's MDO petition and subsequent delay in providing necessary discovery caused the proceedings in the instant case to fall below that minimum, the trial court acted well within its statutory and constitutional authority in dismissing the petition. Consequently, the trial court did not "err[] as a matter of law," and we have no authority to reverse its ruling.

We note, as our own Supreme Court has done in recently affirming the dismissal of an MDO petition, that due to the availability of other statutory avenues of involuntary commitment, such as the Lanterman-Petris-Short Act (LPS Act) (Welf. & Inst. Code, § 5000 et seq.), our ruling "does not necessarily mean [Tatum] will be released." (*Allen, supra,* 42 Cal.4th at p. 95.) "Because [Tatum] has been evaluated and treated only under the MDO Act up to this point, there has been no occasion to determine whether [he] would be subject to the requirements of the LPS Act. [Citation.] Thus, we underscore that our decision should not be construed as requiring [Tatum's] release if he is still in need of mental health treatment. Assuming he still requires such treatment, we presume that responsible parties will take appropriate steps to ensure [Tatum] receives custodial treatment, for as long as is necessary, under the LPS Act." (*Id.* at p. 108; see Welf. & Inst. Code, § 5150.)

I

FACTS

On February 7, 2007, the District Attorney filed a petition in superior court to commit Tatum as an MDO pursuant to Penal Code[1] section 2970. The petition requested that the court appoint counsel for Tatum, that the appointed counsel "provide discovery" to the District Attorney and that the court set a trial date. The petition stated that Tatum had a "severe mental disorder" and was committed to the state Department of Mental Health under section 2962 as a condition of his parole, where he was receiving "continuous treatment." The petition also stated that Tatum's mental disorder was not in remission, and "by reason of his severe mental disorder," Tatum "represents a substantial danger of physical harm to others." The petition noted that Tatum had a "maximum commitment date of March 12, 2007."

After appointing a deputy public defender (Pamela King) to represent Tatum, the court held a hearing on the petition on February 9. Tatum was not present. At the hearing, King stated that the petition was untimely and by law Tatum had a "right to begin trial today." King noted, however, that as she had just been appointed to the case, had no familiarity with Tatum, and had "received no discovery," she was not prepared for trial. She requested that the court calendar a motion to dismiss the petition and stated that her office would "do our best to prepare . . . for trial" before Tatum's "commitment expires." King also requested an order that Tatum be transported to the court for the next hearing.

The deputy district attorney addressed the issue of discovery, stating that to avoid burdening the state hospital with two identical subpoenas (one from the defense and one from the prosecution), he would subpoena Tatum's mental health records "into the court." The deputy explained that the records would then be delivered directly to the court which would notify Tatum's counsel immediately upon receipt, giving the defense the first "opportunity to copy the records." The court then summarized the representation, reiterating that the District Attorney was "going to subpoena all records from the different locations involving Mr. Tatum and make it available for the defense."

The deputy district attorney also acknowledged that "[t]ypically the cases are filed more timely," and that "the burden will be on the People to show why it is—it may or may not have been timely." The court set a hearing date of February 23 "for motion to dismiss and possible trial."

On February 15 Tatum filed a written motion to dismiss the petition. The motion stated that Tatum had served his sentence and had been paroled to

---

[1] All statutory references are to the Penal Code unless otherwise specified.

Atascadero State Hospital, later being transferred to Patton State Hospital. The state Department of Mental Health had prepared a report declaring that Tatum met the criteria for recommitment under section 2970 on July 26, 2006—199 days prior to Tatum's discharge date. The District Attorney failed to act on the report for almost six months, until February 7, 2007. Tatum contended that absent a showing of good cause, this delay required dismissal.

The District Attorney opposed the motion to dismiss, contending that without a showing of prejudice, the court was not required to evaluate the cause of any delay, and the petition could move forward. The District Attorney acknowledged that a report regarding Tatum's need for commitment had been mailed to the District Attorney's Office by the state Department of Mental Health on August 14, 2006. Nevertheless, the District Attorney's "MDO staff became aware on February 7, 2007, that the filing in this matter was in issue" and, after obtaining the paperwork by fax, filed the petition on that date. In an undated, supporting declaration, the assigned deputy district attorney, Diane Harrison, attested that the first time she recalled becoming aware of the case was on February 7, and she "filed the case as soon as she became aware of it." Harrison stated that the case had been entered on the "Master Calendar, kept only by the lead secretary," Barbara Stevens, as of August 29, but Harrison was "unaware of where the case might have been since its arrival" in August, "and it is not possible to ask Barbara Stevens now, due to [a] severe medical condition." Stevens had not worked since January 10, and was in a coma, "unable to speak or write."

The trial court held a hearing on the motion to dismiss on February 26. Deputy Public Defender Don Wingfield appeared for Tatum who was, again, not present, and Harrison appeared for the People. At the hearing, the court found that due to the District Attorney's delayed filing of the petition, the parties "cannot . . . begin trial" as statutorily required—30 days prior to the expiration of Tatum's sentence. Consequently, the trial court ruled, the District Attorney needed to establish "good cause" for the delay.

Harrison reiterated the explanation given in her declaration for the delay, adding that her office had never been able to find the original file for the Tatum case, but had relied instead on a second packet of materials rushed from Patton State Hospital to initiate the February court filing. The court then suggested that rather than a full evidentiary hearing, the parties could stipulate that the report from the hospital arrived at the District Attorney's Office before August 29, 2006, and through negligence, the petition was not filed until February 7, 2007. The parties agreed to the stipulation. The court stated that the District Attorney's Office "simply dropped the ball," and "[a]s soon as the ball materialized, they got on it." The court then ruled, "I cannot

find that there is no good cause," and "basically it's . . . simple negligence"; so "I find good cause" for the failure to begin trial at least 30 days before Tatum's release date.

With respect to scheduling trial, Tatum's counsel then informed the court that he had "just received" 1,200 pages constituting the prison records relating to Tatum, but was still awaiting the mental health records from Tatum's commitment at Patton and Atascadero state hospitals. Counsel added that upon receipt of the hospital records, other records might need to be subpoenaed, and the defense would also need to index the records and have them (as well as Tatum) examined by an expert. The trial court set March 2 as the next possible trial date.

On March 2, Pamela King appeared representing Tatum, who was not present. King informed the court that the defense had still not received any hospital records and consequently could not proceed with trial. King also brought to the trial court's attention a recently published (and since depublished) case with analogous facts, *People v. Price* (2007) 147 Cal.App.4th 955 [55 Cal.Rptr.3d 81], review granted June 13, 2007, S151207 (*Price*),[2] which held that "inexcusable negligence" was not "good cause" for a delay of commitment proceedings past an otherwise applicable release date. The trial judge reviewed the case and noted that it was distinguishable because she had made no finding of "inexcusable negligence." Rather, the judge explained, she had found that "the person who can answer the court as to whether or not [the delay] was justifiable, unjustifiable" or even explain "what happened" is "in a coma." Nevertheless, the judge noted that *Price* appeared to be "right on point," and that she would reconsider her previous ruling after receiving briefing from the parties. In addition, the judge set a date for trial (Mar. 12)—the last day of Tatum's then lawful confinement—on the assumption that the defense would receive the subpoenaed medical records by that date.

On March 12, the trial court announced that after reconsidering its ruling regarding "good cause," it would not change it. The court explained that there "was negligence [on] the part of the District Attorney's office," but unlike *Price*, it was "excusable negligence," and the "reason it is . . . excusable is because we have someone who because of medical issues is not capable of testifying or preparing [a] declaration . . . due to medical issues," and so "I cannot find that this was a horrific error or a horrific mistake or inexcusable negligence by the District Attorney's office."

Tatum's attorney, King, then explained that she was unable to proceed to trial because she had still not received Tatum's hospital records, there had

---

[2] We recognize that review has been granted in *Price*, but we are obligated to reference the opinion because it was incorporated into, and serves to explain, the trial court's ruling.

been no prior commitment hearing and her office had "no history" with Tatum. As a result, King contended, the trial would have to be delayed beyond Tatum's lawful commitment date and consequently, "there is clearly . . . actual prejudice." King argued that "[a]ny minute of" unauthorized involuntary commitment was a violation of Tatum's right to due process, particularly as the cause for the delay was, at best, negligence on the part of the District Attorney's Office.

Deputy District Attorney Harrison stated that her office had received the hospital records the previous week, and she did not "understand why" the defense did not have them. Harrison stated the defense "should have copied them," and it was "perplexing" why they had not. King responded that despite the fact that her office "has been checking in with the court to find when these records would come in," and that King herself had "checked again this morning to make sure that we haven't gotten these records in" and had personally seen Harrison on Thursday (two days after Harrison said she received the records), King had not been notified of the receipt of Tatum's hospital records.

The court acknowledged King's frustration, and noted that "[i]t is interesting" that Harrison's declaration did not say, "I never saw it [the Tatum file], I never touched it," but the court was "heavily relying on Diane Harrison's declaration," and Harrison's status as "an officer of the court," in establishing that the delay was due to a "compassionate issue of an ill member of the office." The court then noted that Harrison's declaration—"signed by declarant on—"—was not dated, causing defense counsel to assert that it was "not a valid declaration." The court agreed, noting as well that the declaration did not explicitly state where it was executed in California. (See Code Civ. Proc., § 2015.5 [requiring sworn statements to be "certified or declared . . . to be true under penalty of perjury" and "if executed within this state" to "state[] the date and place of execution"].)

The court then inquired into the failure of the deputy district attorney to provide the hospital records to Tatum's counsel. Harrison stated that her office had received the records through a court subpoena the preceding Tuesday (six days prior), and had "copied the records sent over from Patton." Harrison acknowledged that "[n]ormally they [the defense] get them first. This time we got them first." Harrison conceded that she had not provided the defense with a copy of the records or notified them of her office's possession of those records. After a short recess in which the court clerk confirmed that the court had never received the hospital records, Harrison explained that the

original records were picked up directly from Patton State Hospital by a member of her office and had subsequently remained at the District Attorney's Office.[3]

Based on the recent revelations, the trial court stated that it was going to "[s]et aside" the previous rulings regarding "good cause," and was requiring the deputy district attorney to submit a valid declaration that addressed both the "circumstances that lead to the late filing," as well as the delivery of hospital records subpoenaed to the court directly "to one side" (the District Attorney), which the court deemed "improper."[4]

On April 13, Harrison filed a declaration, dated April 11, 2007, stating that while she "still ha[d] no specific memory of having this case assigned" to her, she had located the "original request for filing on the Tatum case" during "a third search of . . . her office filing cabinet." Harrison stated that the third search was distinguished from the preceding searches because she went "through each page of documents stapled and/or held together with paper clips." In the new declaration, Harrison acknowledged she "apparently received the request for review and filing . . . from unit secretary, Barbara Stevens, around the date of August 23, 2006." Harrison noted that there was "printing on a sticky note on top of the request for review" in her own handwriting, and she "now believe[d] that she had looked at the case only long enough to write down the number of the underlying criminal conviction." Harrison noted that this occurred "right before leaving on a two-day vacation." Harrison speculated that she brought all her pending work with her and "the Tatum case was with that stack of work," inadvertently becoming paper-clipped to unrelated documents.

On April 27, with Tatum present, the court held its final hearing on the motion to dismiss. At the hearing, Tatum's attorney, King, again emphasized that there was "clear prejudice [whenever] you cannot commence trial before the parole expires," highlighting not only the filing delay, but also the fact that the District Attorney directly obtained the medical records regarding the case and held onto them "for over a week" without notifying her. King argued that despite the court's earlier finding that the delay could not be explained because of Stevens's illness, "subsequent declarations make it eminently clear that [the delay] had nothing to do with Barbara Stevens." King emphasized that the petition should be dismissed and "if Mr. Tatum indeed represents a threat to public safety, there are other statutory schemes

---

[3] Tatum's hospital records consisted of 2,500 pages.

[4] The minute order states: "DDA Harrison is ordered to submit declarations setting forth the circumstances that lead to the late filing of the petition and violating the procedure for receipt and distribution of subpoenaed documents."

that can address that issue." In response, Harrison conceded that an "unfortunate comedy of errors" had led to the motion to dismiss "with mistakes being made."

The court agreed, stating that it would "elevate" the characterization of the process "from comedy of errors to outrageous errors, to callousness." The court noted that it was "outraged" by Harrison's latest declaration, which "says my first and second search did not involve unstapling and taking clips off the pad, oops, of papers. So my third search when I unstapled I found the real reason. In other words, the party submits declarations to the court speculating reasons for delay without even unstapling groups of paper to see whether or not actually the notice was there. That is callousness. That's outrageous." The court stated it was also dissatisfied with the District Attorney's explanation regarding the hospital records: "[T]hey send me a declaration stating" the District Attorney sent someone "to Patton to pick up the paperwork because I knew everybody is in a rush. I got it. I asked them to copy it. Two weeks later or ten days later, I see them on my desk." The court summarized: "It really is very callous for the District Attorney's office not to file on time, then file late, then file declarations stating in it basically untrue, not intentionally, but non-existent reasons for delay, not signing it, not dating it or signing it not under penalty of perjury and then later come and say I unclip[ped] papers and I found the real reason and here is the real reason. It puts the Court in . . . a position . . . of balancing the safety of the community and the due process [rights] of the defendant." The court then took the matter under submission, issuing a written ruling on May 2 granting the motion to dismiss. The ruling states:

"[P]etitioner filed three separate sets of declarations setting forth under penalty of perjury different reasons for delay in the filing of the petition.

"The first two sets . . . set forth good cause for delay due to a serious medical condition of the person in charge of handling the assignment and the management of the caseload. According to the declarations submitted, this individual was unavailable and unable to provide testimony or prepare a declaration.

"Under these circumstances the court found that the unavailability of this witness made it impossible to determine what has happened and what the actual cause of the delay was. . . . [¶] . . .

"At the conclusion of th[e] second hearing it came to the court's attention that the declarations submitted by the Petitioner were replete with deficiencies [necessitating a third hearing.]

". . . Petitioner submitted a third set of declarations contradicting previous declarations and asserting that the delay in filing was caused by misfiling of

the case by the deputy in charge of the case. In other words, the medical conditions of the person in charge of the office [case] management no longer were the reason for inability to determine the actual cause of delay. This time the declaration by the deputy DA clearly explained that the cause for delay was her mishandling of the file.

"Accepting the third set of declarations, and following the reasoning and holding of *People v. Price*, . . . this court . . . concludes that there is no need to determine whether the long delay in filing the petition to extend triggers a presumption of prejudice, because the respondent has clearly shown actual prejudice."

The court then quoted the following discussion from *Price*: " 'Against this demonstration of prejudice we must weigh the justification offered for the delay. The only justification offered—an unexplained failure of the district attorney's office to respond to [the hospital's] paperwork, resulting in what the trial court characterized as a "huge clerical error"—at best represents a type of inexcusable negligence. Inexcusable negligence will not justify a delay in filing. [Citation.] [¶] Weighing the clear prejudice appellant experienced against the inadequate justification provided, we conclude appellant's due process rights were violated by the lengthy delay in the filing of the petition to extend.' "

## II

## DISCUSSION

On appeal, the District Attorney contends that the trial court erred in dismissing the petition. We evaluate this contention after setting forth the applicable statutory framework.

### A. *MDO Proceedings*

■ "[S]tates must ensure due process protections and safeguard liberty interests when a person is civilly committed." (*Allen, supra*, 42 Cal.4th at p. 98, citing *Addington v. Texas* (1979) 441 U.S. 418 [60 L.Ed.2d 323, 99 S.Ct. 1804].) This is because " '[c]ivil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.' " (*Allen*, at p. 98; *Zinermon v. Burch* (1990) 494 U.S. 113, 131 [108 L.Ed.2d 100, 110 S.Ct. 975] [noting that "[p]etitioners do not seriously dispute that there is a substantial liberty interest in avoiding confinement in a mental hospital," and citing cases].) Thus, while " ' "[s]tates have in certain narrow circumstances provided for the forcible civil detainment of people who are unable to control their behavior and who thereby pose a danger to the public health and

safety," ' " these " ' "involuntary commitment statutes" ' " will only be upheld by the courts against constitutional challenge where " ' "the confinement takes place pursuant to proper procedures and evidentiary standards." ' " (*Allen*, at p. 98.)

■ Against the backdrop of these due process requirements, the Legislature has enacted a statutory framework, the Mentally Disordered Offenders Act (MDO Act), codified in section 2960 et seq., which allows civil commitment of certain criminal offenders as a condition of parole, as well as after the expiration of the parole period. (§§ 2962 [listing qualifying offenses], 2964, subd. (a); see *Allen*, *supra*, 42 Cal.4th at p. 99.) To authorize involuntary commitment under the MDO Act, the state must establish beyond a reasonable doubt that (a) the prospective parolee has a severe mental disorder that is not in remission or cannot be kept in remission without treatment; (b) the mental disorder was one of the causes of, or was an aggravating factor in, the commission of his or her crime; (c) the prospective parolee has been in treatment for 90 days or more within the year prior to his or her parole release day; and (d) the prospective parolee has been certified by a designated mental health professional to represent a substantial danger of physical harm to others by reason of his or her severe mental disorder. (§ 2962, subds. (a)–(d).)

■ If the parolee cannot be placed in remission (or kept in remission) during the parole period, the appropriate medical official is required to submit to the District Attorney "his or her written evaluation on remission" and to do so "[n]ot later than 180 days prior to the termination of parole . . . , unless good cause is shown for the reduction of that 180-day period." (§ 2970.) "The district attorney may then file a petition with the superior court for continued involuntary treatment for one year." (*Ibid.*) The statute requires that the petition be filed "[p]rior to the termination of a commitment under this section . . . ." (§ 2972, subd. (e).)

■ Once the petition is filed, the trial court must "advise the person" who is the subject of the petition "of his or her right to be represented by an attorney and of the right to a jury trial." (§ 2972, subd. (a).) The allegations of the petition are then evaluated by a jury (unless the jury right is waived by both parties) and must be found unanimously "beyond a reasonable doubt." (*Ibid.*) "The trial shall commence no later than 30 calendar days prior to the time the person would otherwise have been released, unless the time is waived by the person or unless good cause is shown." (*Ibid.*)

■ At the conclusion of the trial, "[i]f the court or jury finds that the patient has a severe mental disorder, that the patient's severe mental disorder is not in remission or cannot be kept in remission without treatment, and that

by reason of his or her severe mental disorder, the patient represents a substantial danger of physical harm to others, the court shall order the patient" to be recommitted to the state Department of Mental Health for continued treatment. (§ 2972, subd. (c).) "The commitment shall be for a period of one year from the date of termination of parole . . . ." (*Ibid.*) The District Attorney may petition to extend the commitment in one year increments by repeating the process "in accordance with the provisions of this section." (§ 2972, subd. (e); see *People v. Fernandez* (1999) 70 Cal.App.4th 117, 125–126 [82 Cal.Rptr.2d 469] (*Fernandez*).) Even if found to be an MDO, "[a] person shall be released on outpatient status if the committing court finds that there is reasonable cause to believe that the committed person can be safely and effectively treated on an outpatient basis." (§ 2972, subd. (d).)

## B. *Late-filed Petitions and the MDO Act*

■ There is no express statutory deadline for the filing of a petition seeking involuntary commitment of an individual otherwise due to be released at the expiration of a parole period under the MDO Act. The statutory requirement in section 2972, subdivision (a), however, constitutes an implicit requirement that the District Attorney file the petition sufficiently in advance of an offender's release date to allow trial *reasonably* to commence 30 days prior to his or her release. If the District Attorney fails to do so, the petition may be deemed untimely, requiring either a waiver by the offender, or a finding of good cause to excuse its untimely filing.[5]

A trial court's finding of "good cause," if any, is reviewed on appeal for abuse of discretion. (*People v. Kirkland* (1994) 24 Cal.App.4th 891, 909 [29 Cal.Rptr.2d 863] (*Kirkland*); *Fernandez, supra,* 70 Cal.App.4th at pp. 128, fn. 7, 133 [stating that "findings regarding good cause are generally reviewed for abuse of discretion" and applying abuse of discretion standard].) If there is no abuse of discretion, the "good cause" finding stands and there is no statutory violation. (*Kirkland,* at pp. 913, 916.)

■ Even if a statutory violation has occurred, proceedings on the petition may still move forward. This is because, apart from the requirement that a petition be *filed* prior to the offender's release date (§ 2972, subd. (e)), the statutory time limits contained in the MDO Act are not "mandatory" or

---

[5] In the instant case, the trial court made an explicit finding that, given the filing of a first-time commitment petition 33 days prior to Tatum's release date, trial on the merits of the petition could not reasonably commence 30 days prior to the release date. Substantial evidence supports that finding, and the District Attorney does not contend otherwise. As we will explain, a determination that a petition is untimely, however, does not, by itself, warrant dismissal of the petition.

"jurisdictional," but "directory." (*People v. Williams* (1999) 77 Cal.App.4th 436, 451, 456 [92 Cal.Rptr.2d 1] (*Williams*); see *Allen, supra*, 42 Cal.4th at p. 104.) Consequently, even if an MDO trial occurs in violation of the MDO Act's directory time requirements, the commitment proceeding is not rendered invalid absent a due process violation. (*People v. Mitchell* (2005) 127 Cal.App.4th 936, 943 [26 Cal.Rptr.3d 163] (*Mitchell*) [disagreeing with contention under analogous statute that "the trial court must automatically dismiss a tardy section 1026.5 petition if the prosecution cannot demonstrate good cause to excuse the violation of the statutory deadlines"]; *Williams*, at p. 457 [holding that the MDO Act's time limits are not jurisdictional, and thus can be waived, but recognizing that delay in trial regarding commitment implicates "a defendant's rights to liberty and procedural due process"].) Similarly, even when the statutory guidelines are complied with, it is still possible that a due process violation has occurred rendering the proceedings invalid. (See, e.g., *Fernandez, supra*, 70 Cal.App.4th at p. 135 [reviewing for due process violation despite trial court's valid finding of good cause for delay past 30-day statutory requirement].)

The determination of whether the delayed filing of an MDO petition constitutes a due process violation requires consideration of the facts and circumstances of the case and a subsequent "balancing of any prejudicial effect of the delay against the justification for the delay." (*Fernandez, supra*, 70 Cal.App.4th at p. 131; see *Kirkland, supra*, 24 Cal.App.4th at p. 910 [recognizing that "[d]elay beyond th[e statutory] deadlines is judged using '[t]he due process test utilized under both federal and state speedy trial decisions[, which] involves a balancing of any prejudicial effect of the delay against the justification for delay' "]; cf. *Allen, supra*, 42 Cal.4th at p. 105 [explaining that " 'the test' " for determining whether a due process violation has occurred requires that " 'any prejudice to the defendant resulting from the delay must be weighed against justification for the delay' "].) Where there is no prejudice, there is no due process violation, regardless of the reasons (or lack thereof) for the delay. (*Fernandez*, at p. 131 ["If the defendant fails to demonstrate prejudice, the court need not consider the reasons for the delay."]; *Mitchell, supra*, 127 Cal.App.4th at p. 946.)

C. *The Trial Court Did Not Abuse Its Discretion in Finding a Statutory Violation*

In the instant case, the first question we must resolve is whether the trial court erred in finding a statutory violation—i.e., a lack of "good cause" for the District Attorney's delay in filing Tatum's MDO petition. Rather than take on this question directly, the District Attorney perplexingly asserts that "the trial court on several occasions found good cause for not commencing the trial date at least 30 days prior to [Tatum's] parole release," and contends that

these findings undermine the trial court's ultimate dismissal of the petition. The record refutes this argument.

It is true that the trial court *tentatively* found good cause for the District Attorney's delay in filing the MDO petition at the first and second hearings on Tatum's motion to dismiss. The court's conclusion was based, however, on the facts presented to it during those initial hearings which, the court later determined, were inaccurate. At the conclusion of the second hearing, when the court realized that the deputy district attorney's declaration setting forth the facts supporting the trial court's "good cause" finding was invalid, the court explicitly "[s]et aside all [its] rulings" so that it could reconsider "the issues of cause and due process" at the final hearing.

At the third hearing on Tatum's motion to dismiss, the trial court implicitly, but unmistakably, found that there was *not* good cause for the delay. The court's written ruling stated that the "first two sets" of declarations "set forth good cause for delay due to a serious medical condition of the person in charge of handling the assignment." The court stated that the proffered explanation changed in the final declaration, which showed that "the medical conditions of the person in charge of the office [case] management no longer were the reason for inability to determine the actual cause of delay," but instead "the cause for delay was [Harrison's] mishandling of the file." The trial court, quoting *Price*, labeled this explanation for the delay " 'an unexplained failure of the district attorney's office to respond to [the hospital's] paperwork' " and a " ' "huge clerical error" ' " that " 'at best represents a type of inexcusable negligence.' " Again quoting *Price*, the court stated " '[i]nexcusable negligence will not justify a delay in filing.' " (See also *Mitchell, supra,* 127 Cal.App.4th at p. 943 [recognizing that "inexcusable negligence" did not constitute good cause for delay of involuntary commitment proceedings].)

In light of both its written ruling and oral comments at the final hearing, then, it is clear that the trial court (considering both the six-month delay in filing the petition as well as the delay in providing Tatum's hospital records to the defense) found no "good cause" for the District Attorney's delay. In addition, as we will discuss further in the next section, we can find no fault, and certainly no abuse of discretion, in the trial court's conclusion. (See *Kirkland, supra,* 24 Cal.App.4th at p. 909 [good cause finding reviewed under "deferential 'abuse of discretion' standard"]; *Mitchell, supra,* 127 Cal.App.4th at p. 943 [recognizing that "inexcusable negligence" for "tardy filing ran afoul of . . . the statut[e]"]; *People v. Hill* (1982) 134 Cal.App.3d 1055, 1060 [185 Cal.Rptr. 64] (*Hill*) ["confining authorities negligent performance of their duties" was not good cause for delay].)

## D. *The Trial Court's Due Process Analysis Was Not Erroneous*

The District Attorney further contends that even assuming there was no good cause for the delay, the trial court still erred by dismissing the petition. The District Attorney argues that there is nothing "in the statute or case law on the MDO Act to suggest that the absence of a showing of good cause warrants the draconian measure of dismissal." In essence, the District Attorney contends, dismissal of an MDO Act petition is *never* permitted regardless of the circumstances of the case, so long as the committed individual is provided sufficient time (while in continued custody) to prepare a defense to the commitment proceedings.

 The District Attorney's contention is initially rebutted by the language of section 2972. While concededly not jurisdictional, the statute unambiguously states that an MDO trial *"shall* commence no later than 30 calendar days prior to the time the person would otherwise have been released, unless the time is waived by the person or unless good cause is shown." (§ 2972, subd. (a), italics added.) It would be inconsistent with our role in interpreting statutory language to conclude that the Legislature explicitly required a finding of "good cause" or waiver, but intended that there could *never* be any consequence (i.e., dismissal) for the absence of "good cause" or waiver. (*Ibid.*; see *Reno v. Baird* (1998) 18 Cal.4th 640, 658 [76 Cal.Rptr.2d 499, 957 P.2d 1333] [" '[c]ourts should give meaning to every word of a statute if possible, and should avoid a construction making any word surplusage' "].)
 We recognize, as the District Attorney repeatedly contends, that the overriding purpose of the MDO Act is not to protect the rights of the civilly committed individual, but rather to protect the public. The MDO Act, however, also contains an unmistakable intent to accomplish its purpose without occasioning any deprivation of due process of law. Thus, as our Supreme Court has emphasized, "the MDO Act's comprehensive statutory scheme . . . represents a delicate balancing of countervailing public and individual interests" (*Allen, supra,* 42 Cal.4th at p. 98), and while dismissal might be inconsistent with the purposes of the MDO Act in some circumstances, in other cases, it will be perfectly consistent with the MDO Act's "delicate balancing" of individual and public interests. (*Allen,* at p. 98.)

The District Attorney's contention is also belied by the numerous cases that either affirm or require *dismissals* of untimely involuntary commitment petitions under the MDO Act and analogous statutory frameworks. (See, e.g., *Zachary v. Superior Court* (1997) 57 Cal.App.4th 1026, 1037 [67 Cal.Rptr.2d 532] (*Zachary*) [issuing peremptory writ of mandate directing superior court to "enter a new order granting petitioner's motion to dismiss" MDO petition]; *Hill, supra,* 134 Cal.App.3d at p. 1060 [reversing trial court's denial of motion to dismiss petition for commitment]; *People v. Hawkins* (1983) 139

Cal.App.3d 984, 987 [189 Cal.Rptr. 126] (*Hawkins*) [affirming trial court's dismissal of late-filed petition].) Even those cases that have ultimately ruled in favor of sustaining an MDO petition are premised on an assumption that dismissal, while not *required*, was also not legally *foreclosed*. (*Williams, supra,* 77 Cal.App.4th at p. 461 [holding that offender waived claim that petition should have been dismissed by "not making a proper objection and *motion to dismiss* before trial" (italics added)]; *Mitchell, supra,* 127 Cal.App.4th at p. 943 [disagreeing with contention that trial court "must *automatically* dismiss a tardy" commitment petition in the absence of waiver or good cause (italics added)].) Thus, there is simply no basis in the MDO Act or case law for the District Attorney's contention that the trial court was prohibited "as a matter of law" from dismissing the MDO Act petition.

█ It is equally clear, however, that because a violation of the 30-day deadline does not *mandate* dismissal (*Williams, supra,* 77 Cal.App.4th at p. 457), the trial court, in any case in which good cause is lacking, should not "automatically" dismiss an MDO petition, but must evaluate whether dismissal is warranted under the circumstances of the case. (See, e.g., *Mitchell, supra,* 127 Cal.App.4th at p. 943.) Consequently, the question before us is whether the trial court was permitted to dismiss the petition *on the facts and circumstances of the instant case.*

Analyzing the trial court's determination that the circumstances of the instant case warranted reversal, we find no error.[6] To reach this conclusion, we must first set forth what we believe to be the proper legal framework for analysis of a motion to dismiss in this context because, as the trial court noted, the case law is unsettled in this area.

█ Consistent with the large body of case law that has developed over the preceding decades, a trial court faced with the question of whether to dismiss a late-filed MDO petition must evaluate the circumstances of the delay and the implications of continuing with trial under a due process rubric. This analysis, which merges to some extent the statutory requirement of "good cause" and the constitutional mandate of due process, properly recognizes that the MDO Act itself "accommodates procedural due process by requiring the filing of the commitment petition prior to the expiration of the commitment, and requiring trial to commence 30 days prior to expiration in

---

[6] Our review of this question—essentially the trial court's application of constitutional law to undisputed facts—is de novo. (See *People v. Cromer* (2001) 24 Cal.4th 889, 901 [103 Cal.Rptr.2d 23, 15 P.3d 243] [noting that "independent review" of trial court's balancing of competing constitutional interests "comports with this court's usual practice for review of mixed question determinations affecting constitutional rights"]; *People v. Shane* (2004) 115 Cal.App.4th 196, 203 [8 Cal.Rptr.3d 753] [concluding that in reviewing *statutory* speedy trial claim, appellate courts should "apply[] an abuse of discretion standard of review to the trial court's due diligence determination" and contrasting cases involving constitutional claims].)

order to ensure that trial is completed prior to expiration of the commitment." (*Zachary, supra,* 57 Cal.App.4th at p. 1034.)

As we have already noted, due process in this context requires a flexible balancing of "any prejudicial effect of the delay against the justification for the delay." (*Fernandez, supra,* 70 Cal.App.4th at p. 131 ["If the defendant fails to demonstrate prejudice, the court need not consider the reasons for the delay."]; see *Kirkland, supra,* 24 Cal.App.4th at pp. 910, 915–916 [noting that MDO due process analysis looks to analogous law under " 'federal and state speedy trial decisions,' " and "emphasiz[ing] that given defendant's failure to show prejudice, only a minimal showing of prosecutorial diligence was necessary to establish good cause"]; cf. *Barker v. Wingo* (1972) 407 U.S. 514, 530 [33 L.Ed.2d 101, 92 S.Ct. 2182] (*Barker*) [recognizing "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant" as factors to be considered in determining whether dismissal is required for speedy trial violation].) The constitutional inquiry into the "justification for the delay" necessarily overlaps with the statutory inquiry into "good cause." If good cause exists, it is less likely that there will be a due process violation; where good cause is lacking, as in the instant case, a violation is likely if sufficient prejudice is present. In addition, the "[l]ength of delay" will be a relevant factor in evaluating any proffered justification. (*Barker,* at p. 530.) For example, negligence may be sufficient cause to excuse a minor delay, but becomes less compelling as a justification for an extensive delay.

█ With respect to prejudice, in the context of untimely MDO petitions, the courts have recognized that relevant prejudice will generally take one of two forms: (i) an inability to prepare for trial in the time remaining prior to the offender's release date (see, e.g., *Kirkland, supra,* 24 Cal.App.4th at p. 917), or (ii) the involuntary confinement of an offender beyond the offender's statutorily authorized release date. (See, e.g., *Zachary, supra,* 57 Cal.App.4th at p. 1036.) Indeed, when an MDO petition is filed just prior to an offender's release date, the offender is often forced to choose between these two types of prejudice. Either the offender must curtail otherwise necessary trial preparation to ensure a "preexpiration trial" (*Zachary,* at p. 1036) or agree to a continuance of the trial date beyond the release date, thus suffering unauthorized postrelease confinement. Synthesizing what has generally been implied in the case law to date, we glean from the case law and statutory authorities that whenever the state's unexcused late filing of an MDO petition forces an offender to "choose" between these two types of prejudice, *some* prejudice is necessarily established. (See *Hill, supra,* 134 Cal.App.3d at p. 1060 [dismissal of involuntary commitment petition required where "it was realistically quite impossible in the brief time that remained" prior to expiration of commitment "to bring this matter to even the most hurried conclusion with any semblance of due process"]; *Zachary,* at p. 1036

["Petitioner . . . has suffered prejudice, i.e., 24 days of unauthorized confinement in a state mental hospital prior to the filing of the petition for recommitment, followed by continued unauthorized confinement to date."];[7] *People v. Dougherty* (1983) 143 Cal.App.3d 245, 248 [191 Cal.Rptr. 668] [prejudice established where trial preparation was impeded by necessity of conducting trial prior to release date]; *Fernandez, supra,* 70 Cal.App.4th at p. 133 [rejecting claim of prejudice because "extension of the trial beyond defendant's scheduled release date was due to his own counsel's requested continuances, not to the People's failure to comply with any statutory deadlines"].) This conclusion is consistent with our Supreme Court's statement in *Allen,* evaluating a late-filed petition under section 2972, subdivision (e), that when a delay in filing a commitment petition results in a violation of the MDO Act's procedural requirements, the delay "may be deemed prejudicial," even if recommitment would have been authorized had the petition been timely filed. (*Allen, supra,* 42 Cal.4th at p. 105 [voiding commitment after untimely filing of petition under § 2972, subd. (e), and stating that where the MDO "was denied his *annual* review under the MDO Act" (i.e., a review of commitment status pursuant to the requirements of the MDO statute), the resulting delay "may be deemed prejudicial" (italics added)].)[8]

■ The *degree* of prejudice will depend on various factors such as the time required to properly mount a defense (e.g., generally a more significant time period for an initial MDO commitment, as here, than in subsequent

---

[7] Our Supreme Court's decision in *People v. Frye* (1998) 18 Cal.4th 894 [77 Cal.Rptr.2d 25, 959 P.2d 183] does not contradict *Zachary* on this point. *Frye* is an example of the inherent conflict between the "defendant's desire to invoke the right to speedy trial" and "defense counsel's request for a continuance," with the defendant ultimately "expressly consent[ing] to [the] continuance." (*Frye,* at p. 939.) The high court acknowledged that the defendant may have felt obligated to consent to the delay requested by his counsel, but held that "[u]nder these circumstances, we cannot conclude there was any conflict at all between defendant's right to speedy trial and his right to competent counsel" because "[s]ome rights are mutually exclusive" and "hard choices are not unconstitutional." (*Id.* at pp. 939, 940 [illustrating concept of "mutually exclusive" rights by stating that "a criminal defendant has a right to remain silent and a right to testify on his own behalf" but "cannot do both"].) The appropriate analogue to *Frye* in this context would be a case where the district attorney timely filed its petition, but the *offender's counsel* nevertheless requested a continuance (with the offender's consent) necessitating trial after the offender's release date. Here (as in *Zachary*), however, the necessary sacrifice of Tatum's rights (Tatum could have either a prerelease trial or adequate representation, but not both) was a direct result of *the state's* unexcused untimely filing of the MDO petition and later delay in the production of Tatum's hospital records, *not* any inherent conflict between "mutually exclusive" rights. (*Frye,* at p. 940.)

[8] This conclusion requires us to reject the District Attorney's suggestion that any analysis of prejudice requires the trial court to defer ruling on a motion to dismiss until after trial. (*Allen, supra,* 42 Cal.4th at p. 105 [rejecting contention that offender did not suffer prejudice because he would have been committed regardless of delay, and stating that the fact that he "was denied his annual review under the MDO Act . . . may be deemed prejudicial"].)

yearly reviews), and the requisite length of the delay that will be occasioned by the untimely filing. (Cf. *Barker, supra,* 407 U.S. at p. 530.) Whether this prejudice will be sufficient to warrant dismissal of an MDO petition in a particular case depends, of course, on the severity of prejudice and, on the other side of the due process balance, the justification for the delay.

The trial court's ruling in the instant case is perfectly consistent with the legal principles we have summarized above. The trial court found that there was no good cause for the delay (i.e., the "justification for the delay" was minimal), a conclusion whose factual basis is unchallenged by the District Attorney on appeal. The delay at issue was extensive—almost six months—and the proffered justification trivial: the assigned deputy district attorney "mishandl[ed] . . . the file." Finally, the District Attorney exacerbated the delay of the proceedings, also without justification, through its unorthodox redirection of Tatum's hospital records at a time when each additional day of delay necessitated an additional day of Tatum's pretrial confinement.

It is also significant that, contrary to the District Attorney's contentions, neither Tatum and his counsel, nor the trial court can be faulted in any respect for the failure to bring the case to trial in the time remaining in Tatum's parole period, or even soon thereafter. (*Fernandez, supra,* 70 Cal.App.4th at p. 133 [rejecting claim of prejudice based on 12-day postrelease date delay because the "extension of the trial beyond defendant's scheduled release date was due to his own counsel's requested continuances, not to the People's failure to comply with any statutory deadlines"].) A review of the record reveals that there were only two factors responsible for the failure to commence trial prior to Tatum's release date: (i) the District Attorney's nearly six-month delay in filing the petition, and (ii) the District Attorney's failure to notify Tatum's counsel of its redirection of the subpoenaed hospital records, and failure to provide those records to Tatum's counsel. In these circumstances, where the blame for an extensive delay necessitating a postrelease trial rests entirely with the state, the "justification for the delay" is particularly uncompelling.[9]

---

[9] We do not believe that the fact that "[t]he district attorney always stood ready to proceed to trial," is of any significance in this case because the defense could not reasonably have proceeded to trial without Tatum's state hospital records—the documentary record upon which the MDO proceeding was based. (See *Hill, supra,* 134 Cal.App.3d at p. 1060 [dismissal only permissible remedy because "it was realistically quite impossible in the brief time that remained to bring this matter to even the most hurried conclusion with any semblance of due process"].)

We also find unpersuasive the District Attorney's contention that "[a]s a general proposition, the MDO has as much if not greater access to his own mental health records." As we have noted, the deputy district attorney appearing at the initial hearing on this case requested, on the record, that the defense *not* subpoena the records in return for his commitment to immediately subpoena them to the court. This agreement was then memorialized by the trial court.

With respect to prejudice, the trial court properly recognized that the District Attorney's almost six-month delay in filing the MDO petition (and subsequent dilatory actions) would necessitate a significant period of postrelease date, pretrial confinement, and thus, there was "clearly . . . actual prejudice."[10] The prejudice in the instant case was particularly severe, as measured by the length of the unauthorized commitment (the time period between Tatum's release date and the likely commencement of a trial to determine the lawfulness of postrelease confinement), because the MDO trial would constitute Tatum's first contested commitment proceeding, King had never represented Tatum before, and the District Attorney had delayed the production of necessary discovery (consisting of 2,500 pages of hospital records) *until the release date itself*. (See *Mitchell, supra,* 127 Cal.App.4th at p. 946 [highlighting fact that defense counsel "had represented appellant before" in finding no due process violation due to late filed petition].)

At oral argument, the District Attorney highlighted a recent decision by our colleagues in Division Two that suggested (albeit in a slightly different context) that due process is never implicated when an MDO trial is delayed past the offender's release date, because (analogizing to the preliminary hearing in a criminal prosecution) there has been—at the time that the prisoner is initially committed as a condition of parole—a preliminary finding by the state's psychiatrists that the defendant is an MDO, leaving the only question remaining for trial: whether the defendant is *still* an MDO after receiving treatment throughout the parole period.[11] We find this argument far too sweeping, however, as it implicitly invalidates decades of California case law (discussed above), and renders meaningless the provisions of the MDO Act intended to protect the offender's liberty interests (e.g., right to a jury trial). Indeed, if this contention were valid, an offender's trial need not "commence no later than 30 calendar days prior to the time the person would otherwise have been released" (§ 2972, subd. (a)), but can instead be held whenever the state desires, regardless of the reasons for any delay or resulting prejudice, because the *state's psychiatrists* have already resolved (much of) the issue. (Cf. *Zachary, supra,* 57 Cal.App.4th at p. 1036 [rejecting contention that "a presumption of continued dangerousness is effected by the district attorney's mere filing of a petition for commitment under the MDPA"; "[t]o the contrary, the MDPA requires the People to prove beyond a reasonable doubt that the committed person continues to pose a substantial danger of

Consequently, we can find no fault with defense counsel's failure to personally subpoena Tatum's records in violation of the parties' court-sanctioned agreement.

[10] The District Attorney represented at oral argument that Tatum is, in fact, still detained pending the appeal, and consequently has now been held for one year since his "release date" despite never having received a hearing on whether postrelease confinement is authorized under the MDO Act.

[11] *People v. Cobb* (2007) 157 Cal.App.4th 393 [68 Cal.Rptr.3d 625], review granted March 12, 2008, S159410; as review has been granted, the opinion is no longer citable.

physical harm to others"]; see also *People v. Gibson* (1988) 204 Cal.App.3d 1425, 1436 [252 Cal.Rptr. 56] [invalidating previous "MDO commitment scheme" as unconstitutional on equal protection grounds because it "contains one critical and significant difference from all the other[] [commitment schemes]; it does not require proof of any present dangerousness as a result of mental illness for commitment or recommitment"].) In fact, the weakness of the District Attorney's contention (essentially relying on state psychiatrists to fill the statutory and constitutional role of trial courts) is particularly apparent in the instant case where there appears to be a substantial *legal* question as to whether Tatum's underlying "controlling" offense (i.e., the offense for which he was on parole)—"gassing" (§ 4501.1, subds. (a), (b))—is a qualifying offense under the MDO Act,[12] a question that a psychiatrist (unlike a trial court) is ill-suited to resolve. Finally, this contention ignores the Legislature's decree that even if a person is deemed an MDO under the statute, the courts are still called upon to determine whether outpatient treatment is a safe and effective alternative to inpatient commitment, in which case such outpatient treatment (i.e., release from state custody) is mandated. (§ 2972, subd. (d).)

In sum, given the circumstances of this case, the justification for the delay did not outweigh the resulting prejudice, and thus there was a due process violation requiring dismissal of the petition. (See, e.g., *Hill, supra,* 134 Cal.App.3d at p. 1060 [delay in filing of petition under analogous statute due solely to "negligen[ce]" required dismissal of involuntary commitment petition because "it was realistically quite impossible in the brief time that remained to bring this matter to even the most hurried conclusion with any semblance of due process"]; *Hawkins, supra,* 139 Cal.App.3d at p. 987 [affirming trial court's dismissal of late-filed petition for extended involuntary confinement where good cause not shown].) Consequently, we affirm.

---

[12] The District Attorney's filings below allege that Tatum was on parole for the crime of "gassing," an allegation supported by the confidential psychiatrist report attached to the MDO petition. (See § 4501.1, subds. (a), (b) [felony offense to "intentionally plac[e] or throw[]" on a peace officer "any human excrement or other bodily fluids or bodily substances or any mixture containing human excrement or other bodily fluids or bodily substances that results in actual contact with the person's skin or membranes"].) The District Attorney's brief on appeal citing these same materials states that Tatum was "imprisoned on a violation of Penal Code § 4501[, subdivision ](a)"—a different provision relating to assault with a deadly weapon by a person confined in state prison.

The MDO Act authorizes postrelease date commitment for prisoners convicted of certain enumerated crimes (not including "gassing") as well as, in a catch-all provision, unenumerated offenses where the "prisoner used force or violence" or "expressly or impliedly threatened another with the use of force or violence likely to produce substantial physical harm." (§ 2962, subds. (b), (e)(2)(P), (Q); see *People v. Kortesmaki* (2007) 156 Cal.App.4th 922, 926 [67 Cal.Rptr.3d 706].) As the trial court did not reach the merits of the petition for commitment, it was not required to determine whether Tatum's underlying offense qualifies him for involuntary commitment under the MDO Act.

It should go without saying that regardless of the strength (or weakness) of the underlying case for Tatum's involuntarily commitment, that commitment must be accomplished through the procedures set forth by our Legislature and consistent with the due process rights vested in every citizen by the federal and state Constitutions. (*Allen, supra*, 42 Cal.4th at p. 98; *Hill, supra*, 134 Cal.App.3d at pp. 1060–1061 ["Our belief in the concept of judicial restraint, and our deference to the powers granted our coequal governmental partners, cannot be limited to those instances where, after viewing the fruits of their labors, we find them good."].)

We emphasize that where, as here, the District Attorney fails to act in a sufficiently timely manner to enable an involuntary commitment under the MDO Act, the Legislature has enacted other statutory schemes that allow involuntary commitment outside of the parole context, such as the LPS Act, that may apply if Tatum "is a danger to others, or to himself." (Welf. & Inst. Code, § 5150; *Allen, supra*, 42 Cal.4th at p. 105 [highlighting that "[o]ur decision . . . will not necessarily result in Allen's release" because "[a]l-though Allen does not fall under the jurisdiction of the MDO Act, we agree with the Court of Appeal majority that Allen might still be involuntarily committed and treated under the LPS Act"]; *People v. Hernandez* (1983) 148 Cal.App.3d 560, 565 [196 Cal.Rptr. 31] [same]; *Hill, supra*, 134 Cal.App.3d at pp. 1060–1061 [same].) Beginning with a 72-hour detention for evaluation and treatment, the LPS Act contains a " 'carefully calibrated series of temporary detentions for evaluation and treatment' " that can ultimately lead to renewable one-year commitments, similar to those permitted under the MDO Act. (*Allen*, at p. 107.) Thus, we again underscore "that our decision should not be construed as requiring [Tatum's] release if he is still in need of mental health treatment. Assuming he still requires such treatment, we presume that responsible parties will take appropriate steps to ensure [Tatum] receives custodial treatment, for as long as is necessary, under the LPS Act." (*Id.* at p. 108; Welf. & Inst. Code, § 5150.)[13]

---

[13] In *Williams, supra*, 77 Cal.App.4th 436, our colleagues in the Sixth District suggested a hybrid procedure for situations where the District Attorney's failure to act in a timely fashion may endanger public safety, that would "achieve the purposes of the MDPA, and also protect a defendant's rights to liberty and procedural due process." (*Williams*, at p. 457.) The court stated that if "it became clear that it was impossible to complete trial before a release date and the defendant did not waive time," the trial court "could provide adequate time to prepare for trial and properly maintain the custodial status quo pending the trial" *if* "at the hearing to determine good cause to excuse noncompliance with the 30-day requirement, the parties addressed and the court determined whether there was probable cause to believe the MDO, as a result of a mental disorder, posed a danger to others if released on schedule and before a final determination of the petition. (Cf. Welf. & Inst. Code, § 5150 [involuntary detention for 72-hour period of evaluation authorized on finding of probable cause that person is dangerous to others or gravely disabled] [citations].)" (*Williams*, at p. 457.) The *Williams* court recognized, however, that the MDO Act did not "require such a determination" (77 Cal.App.4th at

## DISPOSITION

Affirmed.

Nares, Acting P. J., and Aaron, J., concurred.

---

p. 457, fn. 9), and whether or not such a hearing would have obviated the due process violation is not before us as the trial court made no such determination in the instant case.